May it please the court, Michael Brennan on behalf of Shirley Smith, the petitioner. The issue before this court... You're the handsome, gray-haired guy that walked in here, huh? I'm a little shocked to see the court in session. Good to see you, Judge. Good to see you. A long time. The issue before this court, obviously, is whether there is sufficient evidence to support Ms. Smith's conviction for intentionally shaking this infant, causing his death, and thereby supporting her life sentence. There is absolutely no observable medical evidence in the record to support the testimony of the two coroners in this case, Drs. Carpenter and Ehrlich. All of the experts, all five of the experts, agreed on almost all of the facts, both the observable facts from the autopsy, the neuropathological exam, the eye exam. They also agreed about the fact that there are two principal causes of death in SIS cases, that being massive hemorrhaging of the brain or massive swelling of the brain. Both of those conditions end up with a herniation that crushes the brain stem, causing death. Everyone agreed, all five experts agreed, to these two principal causes of death. Dr. Carpenter testified, even though he did not perform the autopsy. He is called first, and he testifies that even though neither of these mechanisms were present, that being massive bleeding or massive swelling, and that there were no observable external or internal injuries to this infant who was seven weeks old when he died, that the infant died as a result of shaken baby syndrome. In order to explain this conclusion to the jury, what he postulated was a theory that has no known medical support. That being... Wasn't that up to the jury? It's not up to... Based on what they had, that they would decide it on whatever information they had? What we are submitting to the court, Your Honor, is the fact that there has to be, or there should be, some basic medical science that supports this doctor's conclusion. There is none. There was no observable medical evidence in the record. Now, one of the keys that seemed to me was in this case, did the prosecution witnesses at the trial testify that the child could have died from this shaken baby syndrome, in spite of the fact that there is no evidence of tearing of the brain or the brain stem or massive swelling? Dr. Carpenter and Dr. Ehrlich, the two coroners involved in the case, both testified that this baby died as a result of... This was an instantaneous death. The shaking of the child had to be so violent that the baby virtually died instantly, and as a result of that instant death, there was no observable trauma inside the baby's skull. And then the defense witnesses testified there would have to be that, and the jury decided in favor of the prosecution? Your Honor, the defense witnesses testified that that theory was fantasy, that they knew of no medical evidence. So it was up to the jury, then, to make that credibility determination? We're submitting to the court that the jury did decide, obviously, that this theory of instantaneous death with no observable internal or external injuries was believable. We're submitting to the court that that is not sufficient evidence. This conclusion by Dr. Carpenter, that that was the reason for the baby's death, is not supported by any known medical literature or evidence. He didn't cite any during the course of his testimony. The defense witnesses testified that they knew of no such literature that supported this conclusion. There is absolutely nothing in the record other than Dr. Carpenter's conclusion that this was an SIS case. Dr. Ehrlich testified that way, too, didn't she? She testified to that after Dr. Carpenter testified. This was Dr. Ehrlich's first autopsy involving an infant with suspected abuse. And when she started the autopsy ---- Well, that was probably brought out to the jury. They knew she was an amateur just getting started. She testified to the fact that this was the first autopsy in which there was any issue of suspected child abuse, but that issue didn't arise until during the course of the autopsy itself. This case had initially been diagnosed as a SIDS case, and it wasn't until there was a small amount of blood found during the course of the autopsy that Dr. Carpenter and Dr. Ehrlich changed their opinion. They both, however, testified that this small amount of blood that they saw during the course of the autopsy was not the cause of death. This was not sufficient bleeding to cause death. They came up ---- Their conclusion was that there was this instantaneous death caused by tearing of the brain tissue, but there was no observable tearing of any brain tissue. The brain stem was intact. It was not damaged. It wasn't even submitted for further examination because both Dr. Carpenter and Dr. Ehrlich agreed that there was no damage to the brain stem. Well, they agreed that you wouldn't be able to see any. Well, that's the problem. Even if you cut it up, you wouldn't be able to see any is what I think he testified. Right. What they said was because the death was so instantaneous, there was no chance for evidence of trauma to develop. It's a theory that is absolutely unsupported by any known medical evidence. They didn't cite to any. They didn't say here are the documents or here is the evidence that we've relied on in coming to this conclusion because there is none. All of the known medical literature, and they all testified, all five experts testified to the fact that there are two principal causes of death in SIS cases, massive hemorrhaging, massive swelling. Moreover, the defense witnesses testified that these processes, massive hemorrhaging and swelling, take time to develop, a matter of hours, days, sometimes weeks, before an infant will die as a result of baby shaking. In this case, the testimony of Carpenter and Ehrlich was that this death was instantaneous. Now, in fact, what I think the record supports is that this baby died of SIDS. When Shirley Smith picked up this child at 3.30 in the morning, she testified that his head flopped back, that he had defecated before she picked him up, he was not breathing. When the medical people got to the apartment, there was no pulse, there was no respiration. He was dead when she picked him up. Now, she testified and admitted that she did jostle him to try to get some response from him when she picked him up, but that jostling would not have been sufficient to cause the type of injury that Carpenter and Ehrlich testified to. This type of injury that would have caused this baby to die would have not only resulted in its death, but would have resulted in other types of external and internal injuries. There was no bruising of this child on its body. There were no broken bones of any kind. There was no hemorrhaging. There was no retinal hemorrhaging. All of the doctors' tests agreed that there was both recent and older bleeding in the child's skull. Did the defense present evidence that there was science, scientific books or records, or something to support their viewpoint, or did they just rely on what the professor said about this, that this is fantasy? No. All five experts agreed to the principal causes of death in SIS cases. There was no dispute that massive hemorrhaging, massive bleeding. You can't really fault the prosecution for not putting in evidence to support their scientific viewpoint. Yes, I believe you can when you're coming up with a theory which is a novel theory. If they had come into court and testified we saw massive bleeding and that was the cause of death, that would be absolutely consistent with an SIS diagnosis. Does the AEDPA test apply here, do you think? I'm sorry? The AEDPA test. Are you familiar with that? I'm not. I'm sorry. Okay. Then pass it. If Carpenter and Ehrlich were going to rely upon this instantaneous death slash no observable injury theory to support a conclusion that the child died as a result of SIS, one would think that there should be some basis in fact for that opinion. Neither testified that they had ever done an autopsy before in which they personally had observed similar findings. Similarly, they did not testify to any medical literature that they relied upon in coming to this conclusion. There simply is none as far as I'm aware. When the baby was put to sleep, he was put to sleep, as I recall, face down on the couch? That's correct. This baby was born a little over five pounds. He was underweight two weeks early. He slept. The mother placed him on his stomach to sleep. He also had a slight heart murmur at birth, jaundice at birth. One of the defense experts testified that these are all predisposing factors for SID's death. This child had no observable trauma, was picked up, found dead, our submission obviously, at 3 o'clock in the morning. Was there any testimony that SID's can result when a baby is placed face down? Well, everyone agreed that when babies are placed face down to sleep, particularly infants, that is the usual scenario for a SID's death as opposed to a baby that's placed on its back. Moreover, the scenario in the house, in this apartment, is totally inconsistent or incompatible with the State's case. Here is a grandmother who was sleeping within a couple of feet of this infant. This infant is feeding every two hours. It's seven weeks old. The only reason for this child to wake up in the middle of the night and be crying and upset would be because it's hungry. That grandmother, Mrs. Smith, would not have tried to put this baby back to sleep by shaking it back to sleep. The mother was a matter of feet away in the bedroom. If the baby was hungry, she obviously would have just taken the child into the mother and said, Here is Edsel. It's time for him to be fed. The State's theory is the baby woke up. He was crying. He upset Mrs. Smith. Mrs. Smith got so upset, she shook him to death in the middle of the night, a seven-week-old baby who there is no testimony. And what basis would this Court determine on this record that there was or wasn't a scientific basis for the prosecution doctor's testimony? Because there's nothing in the record that supports their testimony. They did not refer at any time to any medical evidence to support their theory. They didn't they wouldn't even ask whether their opinions, which they were offering, that they offered them based upon a reason. There may be science out there, but no testimony was offered? Your Honor, all I can offer you is that I did extensive research to try to determine myself whether I could find any support for this theory. How could this Court then take that into consideration, your research or additional medical documents? The Court should not. The Court obviously is limited to the record that was submitted to the jury. All I can offer is that there is no support in the record, nor could I find any support for this type of a theory. A doctor who says, my opinion, the cause of death is so-and-so, I have to say, and I base that on Gray's Anatomy and the test in the New England Medical Journal last year and so on. Or can the doctor simply express that opinion without stating the basis for it? In a case such as this, where you have five medical experts, and only two of whom have this instantaneous death theory, you would think that before a jury would be allowed to decide that this woman is guilty of, in effect, murder and sentence her to life in prison, that there should be some support for a theory that no other doctor who testifies in the case even knows about. The defense expert, Dr. Siegler, said that this theory, this instantaneous death, no observable injury, was fantasy. He had never read anything. Did they base that on the fact that there was no, what, retinal bleeding or damage to the brain stem? All of the doctors agreed that in 75 to 85 percent of all SIS cases, there was retinal bleeding. And Dr. Siegler testified that in all of the cases he was aware of, in which a baby had died as a result of instant or shaken baby syndrome, that 100 percent of those deaths he observed retinal bleeding. This is a doctor who had performed 5,000 to 8,000 autopsies. This is hardly someone who was not qualified to offer an opinion. He said he was not aware of any such theory of instantaneous death slash no observable injury. All of the doctors, including Carpenter and Ehrlich, agreed to the basic medical field with regard to shaken baby syndrome. That being, these are the types of symptoms that one almost always sees in a case in which a child has died. All right. Well, let's hear from the State. Good morning, Your Honors. Deputy Attorney General Richard Breen, on behalf of Respondent and FLE Gwendolyn Mitchell. Respondent's position is that AEDPA does apply, but Respondent does understand that that issue is a bit unsettled in the Ninth Circuit, how to treat the magistrate judge who decided this used AEDPA. It appeared that the magistrate judge went more to a straight application of Jackson versus Virginia. Well, well, AEDPA was cited in the standard of review in the magistrate's court. Should it be limited to Jackson to Jackson case test or should it superimpose AEDPA on top of that? Respondent's position is that AEDPA should be superimposed on an application of Jackson. Obviously, this matter falls squarely within AEDPA, given the date at which the conviction was final and the petition for rid of habeas corpus was filed in federal court. And AEDPA is consistent with, you know, exactly with the kinds of things Your Honor was talking about in terms of bringing in additional evidence. AEDPA requires that we look at whether the rejection of this claim by the California Court of Appeal was a reasonable application of Jackson versus Virginia. And that that is a different analysis than whether in the abstract Ms. Smith is entitled to relief under Jackson versus Virginia. So, yes, Respondent would advocate that AEDPA applies. So it's the question is, is it reasonable for a state court to think that no rational jury that any rational jury could have convicted? Correct. Was the determination of the court of appeal. We can say that, well, the state court was wrong. She's innocent. But it wasn't unreasonable for them to think that a rational jury could, even though they happen to be wrong. It wasn't. They weren't unreasonably wrong. Well, that's correct. And I would point you, you know, there's support for that even in a case like Herrera versus Collins, which points out that even when you're applying Jackson versus Virginia, it's not so much whether the trier of fact was correct or incorrect. It's whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt. No, it's even worse than that. I mean, it's even more attenuated than that. Correct. In your view, at least, whether it was reasonable for some state appellate court to think, even if they thought incorrectly, that a rational jury could convict. Correct. If they weren't unreasonably incorrect, then we have to deny habeas. Yes. How concerned should we be that she's probably innocent? I mean, you know, the magistrate listed the things that are troubling about this case. It's just not in the pattern. You know, this isn't some young parent who's on drugs and didn't want a child and so on. This is a grandmother who's been caring for these children for some time. And I understand that concern. We reduced the crime rate by putting her in jail for life. Let's put it that way. But she's sleeping on the floor, right? Wasn't she sleeping on the floor by the baby? According to her statements that were relayed through others or her statements to the police, she was sleeping on the floor. There were a lot of people in that house. She was sleeping on the floor. The kid was on the couch. There were two other kids on the couch. As far as I understand, Your Honor, one other child on the couch and one on the loveseat. Okay. One loveseat. And she had no history of her abusing children. If I can address that, and I think that's fairly straightforward, that's not an element of this crime. This crime is given the circumstances. I know it's not an element of this crime. But, you know, the cases that I've been involved in, not in the federal court but in the state court, where you have children that are abused, there's a long pattern, you know, that goes on. But, again, Your Honor, there's a difference between, and there is a crime in California which is continuous abuse of a child. And that's not what's charged here. We're talking about a single incident of assault. And that's something that can be proved circumstantially through who had care and custody of the child, what adult was in charge. How about the fact that the baby was sleeping face down? And if I could address the medical evidence, I'll go straight to that. I might disagree with the characterization of appellant's counsel that all the medical experts agreed as to the circumstances under which a diagnosis of shaken infant syndrome would be proper. The three prosecution experts all diagnosed shaken infant syndrome. Two of those experts had participated in the autopsy. The other expert was a board-certified pediatrician whose area of specialty was distinguishing accident from child abuse. Now, the contrast to that with the defense experts and appellant's counsel makes a lot of the opinions of Dr. Sigler. Well, Dr. Sigler was shown to the jury to have been a pathologist. He'd never done an autopsy in the era when there was shaken infant syndrome for children. All of his published work was on cancer and leukemia. Dr. Sigler was not an expert in neuropathology, forensic pathology. How about the argument that there's no science to support the prosecution doctor's opinion? Given the scope of review under Jackson v. Virginia, whether on the entire record there is evidence from which a rational prior fact could find the defendant guilty beyond a reasonable doubt, the evidence comes from Dr. Carpenter, who testified to in his experience, his training, that you can have an instantaneous death from a whiplash shearing brain injury. Now, appellant's counsel kept referring to, well, there's no sign of injury. Well, sure there is. You have fresh bleeding hematomas inside the brain. You have optic nerve bleeding that's fresh optic nerve bleeding. And even one of the defense experts, you know, admitted this on cross-examination. The optic nerve is connected to the retina. You've got bleeding on the eye in a suspicious area. And what's consistent with Dr. Carpenter, Dr. Chadwick, and Dr. Earle's conclusion is that you do have this abrasion bruise on the back of the head. And what Dr. Carpenter is describing is taking an infant. I thought that the standard stuff was that it had to show an injury to the brain, a tearing of the brain or brain stem, that that's what normally is seen. Is that right? There were two theories. One of them would be a hematoma, which causes an amount of bleeding sufficient to press down on the brain and suppress the lower brain stem. What Dr. Carpenter was talking about was a shearing of nerves within the brain caused by that whiplash action. In other words, not a buildup of fluid, which then suppresses brain function, but instead a sudden traumatic injury which ceases breathing and heart activity. And what, in their opinion, what was consistent with that was the forensic evidence of the new bleeding in the brain, the subarachnoid and subdural hemorrhaging that they noted, as well as the optic nerve bleeding. But that's also consistent with the other evidence at trial. And that's something we really, the appellant's counsel didn't get into that much, but you do have everyone saying up and down, this is a healthy baby. You know, the mom is saying the baby was fine that night. There was nothing wrong with him. For two weeks he was fine. And what's kind of interesting to note, and it's, you know, you talked about the credibility differences and the jury's determination as to, you know, it's a classic battle of the experts, who's right. They've got the, you know, credentialed people before them. The defense experts didn't agree on a cause of death. And you have one defense expert saying that this is death from a traumatic injury. When it happened to that defense expert was the question. But that defense expert, and that was Dr. Sigler, said that this was a death from trauma, with the issue being when did it occur. I guess he thought it occurred earlier. He thought it occurred earlier. But that's something that would be significant to the trier effect, with strictly weighing the expert testimony. And, you know, getting back to your Honor talking about the child being laid down, part of the problem with that is Smith's story changes over time. And you do have her saying, making statements about shaking the child after being confronted with the suspicion of shaken infant syndrome. You do have the highly incriminating statement of, oh, my God, did I do it, in conjunction with statements to the police in which she's now describing, oh, well, I had to shake him a bit to get him awake, things she never told to her daughter. Those statements by appellant were all consistent with the prosecution theory. I mean, she said she shook the child, you know, to awaken the child, and then the child is dead. And she said, oh, my God, did I do it. You know, what does that mean? Did I kill the child? Or, I mean, it doesn't. And that's significant, Your Honor, as a timeline of the paramedics arrive. Smith says, I think he fell down and fell off the couch. She tells her daughter, oh, I got up in the middle of the night, he fell on the couch. Never talking about shaking. The social worker, after the autopsy results come in, confronts Smith and says, hey, we think the baby's been shaken. And it's at that point that Smith starts saying, oh, well, I shook him. Now the detail's added, oh, I shook him, did I do it. That's where it's significant, Your Honor, is that that's not her statement throughout. That's something that's added later on. Suppose that you had a legal, a medical theory that was based on the moon being made of green cheese, and the doctors testify however they do, but that's the basis of it, which is ludicrous. What should this court do? And that didn't come out at the trial. In other words, a totally unsupportable proposition scientifically. In the instance of nothing, you're limited to the record evidence. And this is Herrera v. Collins. We don't have a freestanding claim of actual innocence on habeas corpus. AEDPA applies. This claim was raised to the state court. We have to give deference to the state court's determination of whether we all agree the Supreme Court precedent being Jackson v. Virginia applies. That's exactly what the California Court of Appeal applied. In that situation, I would say the thing I was positing was that a rational jury couldn't decide that because the moon isn't made of green cheese as far as I know. And that would be a different factual scenario. This case doesn't present something where no rational jury could find that a seven-week-old infant who has no neck control whatsoever could be killed by a whiplash shaking injury. I don't think that you can say that all deaths from brain injury are caused by over a long period of time from hematoma. See, the reverse isn't true either. There is such a thing as people being killed suddenly or from a sudden blow. I don't want to use up your time. And I do think my time has been used up. Go to anything else. You said a minute ago there was lots of testimony that the child was fine. Is that inconsistent with sudden infant death syndrome? That would be consistent with SIDS with the exception that you have forensic evidence of trauma. The forensic evidence of trauma, there goes the SIDS theory right there. That's why you don't have two defense experts getting up and saying this is definitely a SIDS case because there is no indication within the brain of trauma. It's exactly the opposite. You say, well, I've got no indication that this child had any brain injury, eating fine, sleeping fine, doing things that infants do. And then suddenly now the infant's dead with forensic evidence of trauma that even a defense expert says, yeah, there's evidence of brain trauma here. That's inconsistent with SIDS. And I do realize I have gone over my time. If the Court has further questions, I'd be happy to address them. All right. Thanks. We'll give Mr. Brennan a pen and paper rebuttal. Thank you, Your Honor. The point is that the evidence of trauma in this case, the old bleeding and the new bleeding, all five experts agreed did not cause this child's death. Now, but would that be determinative? In other words, if the theory is, look, sudden shaking did a tear somewhere in the brain that controls breathing, well, how do we know how that happened? And they'd say, well, we think it happened because the child was shaken because of other injuries, maybe not ones that caused it. For instance, if there was a broken arm, you'd also say it didn't cause the death. But it would be evidence of trauma. If Carpenter or Ehrlich had testified that this evidence of bleeding, this trauma, old bleeding or new bleeding, was in any way tied to their instant death theory, I would agree with you. But they never testified that there was any connection between the old bleeding, new bleeding, and this instant death theory. They did not at any time try to connect those two. They didn't say that this was the cause of death. They said exactly the opposite. This new bleeding and certainly the old bleeding, which was anywhere from 90 hours to two weeks old, everyone agreed that this was insufficient bleeding to cause death. Dr. Sigler testified that the CPR that was performed on this seven-week-old infant for a period of up to 30 minutes would have been sufficient to cause that bleeding. We're talking about less than one tablespoon of blood in this entire infant's skull. That's a very small amount of bleeding when you're talking about sufficient trauma to cause death. It was insignificant, and all of the doctors agreed. So to say that there is trauma, therefore this theory of instant death, no observable shearing, makes sense or is tied together, is just not the record. Carpenter and Ehrlich never tried to connect old bleeding, new bleeding to their shearing theory. And there is no evidence of shearing, absolutely none. The brain shows no evidence, the brain stem, no evidence of any traumatic injury to either. And it's upon that basis that the jury cannot find sufficient evidence to support the conclusion by Carpenter. For Carpenter to get up and say, I know what happened, is not sufficient evidence. The jury cannot just take that statement alone, and that's all there is. There's nothing else in the record other than Carpenter saying, in my opinion, this is what happened. I've never seen it before. I can't point you to any medical literature that supports this theory, but I'm telling you, this is what happened. That isn't really what his testimony was, was it? Well, implicitly he said, this is my opinion, but I've got absolutely nothing to support it. No, but implicit in the fact that the prosecution didn't put on. Only implicit, but he didn't testify that way. No, he didn't say that, but there's absolutely nothing in the record supporting that theory. And it would seem that if you're going, as you just postulated, if you're going to come up with a new theory, something that no one else has heard of before, or a different theory at least, you're going to say, I've seen this before. I've done autopsies in SIS cases before, and this is similar or the same. Or here's the literature, you know, upon which I base my opinion. There's none of that. He doesn't even testify to a reasonable medical certainty that that was the cause of death. He just says, there's this shearing thing that went on, and that's why the baby died. This was a healthy baby. Healthy babies are babies that are SIDS babies. I mean, that's a definition of a SIDS death. This is a healthy baby who all of a sudden in the middle of the night dies. And there is no observable trauma to the child to explain the death. Now, there are predisposing factors that we have been able to identify that are consistent with SIDS death. And that's what Dr. Goldie said. He said this child's predisposing factors, low birth weight, third child to this mother, being placed on its stomach, all are consistent with SIDS. Dr. Sigler said, no, I think that the older bleeding that was as much as two weeks old is possibly, possibly the cause of death. He said, quite frankly, there is not sufficient evidence in this record. Apparently the jury didn't buy his version. Obviously not. But he said that there is insufficient evidence in the record for the coroners to come to any conclusion concerning the cause of death. This case should have been reported as undetermined. He said that when they found the evidence of new bleeding and they called LAPD and said, wait, we're switching from SIDS to SIS, but then two weeks later when they come to the further neurological...
judges: Pregerson, Canby Reed